IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TEKSYSTEMS, INC., et al.,       *

    Plaintiffs,       *

v.       *       Civil Action No. GLR-24-3084

ALEXIS PERLSON,       *

    Defendant.       *

***

## MEMORANDUM OPINION

THIS MATTER is before the Court on: (1) Plaintiffs TEKsystems, Inc. and Allegis Group, Inc.'s ("Allegis") (collectively, "TEKsystems" or "the Company") Motion for Summary Judgment (ECF No. 44); (2) Defendant Alexis Perlson's Cross Motion for Summary Judgment (ECF No. 52); and (3) TEKsystems' Motion to Seal (ECF No. 58). The Motions are fully briefed, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2025). For the reasons outlined below, the Court will grant the Motions in part and deny them in part.

## I.    BACKGROUND

### A.    **Factual Background**[1]

TEKsystems, a wholly owned subsidiary of Allegis, engages in the business of recruiting, employing, and providing the services of technical service personnel, including,

---

[1] Unless otherwise noted, the facts outlined here are set forth in TEKsystems' Third Amended Complaint (ECF No. 34). To the extent the Court discusses facts that TEKsystems does not allege in its Third Amended Complaint, they are uncontroverted, and the Court views them in the light most favorable to the non-moving party, Anderson v.

but not limited to, programmers, engineers, network specialists, systems administrators, technical support specialists, helpdesk support, security analysts, and other IT positions on a temporary or permanent basis to companies throughout the United States. (3d Am. Compl. ¶¶ 4, 11, ECF No. 34). Defendant Alexis Perlson is a former TEKsystems employee. (Id. ¶ 17). Perlson served as an Account Manager and then later as a Service Account Manager until she resigned on August 23, 2024. (Id.). Broadly speaking, Perlson placed skilled IT professionals at companies in need of such staffing. (Perlson Dep. 18:12–16, ECF No. 45-2). For the last few years at TEKsystems, Perlson was assigned to one insurance carrier as her major account. (Id. 17:15–18:5; 3d Am. Compl. ¶ 17).

When she began her employment with TEKsystems, Perlson signed an Employment Agreement that contains non-competition, non-solicitation, and non-disclosure provisions. (See Emp. Agreement ¶¶ 3–6, ECF No. 45-3). The non-competition provision prohibits Perlson, for a period of eighteen months, from:

> engag[ing] in, or prepar[ing] to engage in, or be[ing] employed by any business that is engaging in or preparing to engage in, any aspect of TEKSYSTEMS' Business for which EMPLOYEE performed services or about which EMPLOYEE obtained Confidential Information during the two (2) year period preceding termination of employment, within a radius of fifty (50) miles from the office in which EMPLOYEE worked at the time EMPLOYEE's employment terminated or any other office in which EMPLOYEE worked during the two (2) year period preceding termination of employment ("Restricted Area").

(Id. ¶ 3). The non-solicitation provision prohibits Perlson from:

---

Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The Court will address additional facts when discussing applicable law.

> directly or indirectly . . . [c]ommunicat[ing] with
> any . . . customer of TEKSYSTEMS and, about which
> EMPLOYEE obtained Confidential Information or with which
> EMPLOYEE did business on TEKSYSTEMS' behalf during
> the two (2) year period preceding termination of employment
> for the purpose of . . . entering into any business relationship
> with such customer if the business relationship is competitive
> with any aspect of TEKSYSTEMS' Business for which
> EMPLOYEE performed services or about which EMPLOYEE
> obtained Confidential Information during the two (2) year
> period preceding termination of employment, or . . . reducing
> or eliminating the business such customer conducts with
> TEKSYSTEMS . . . .

(Id. ¶ 4). The non-disclosure provision prohibits Perlson from: "us[ing], disclos[ing] or

divulge[ing] any Confidential Information of TEKSYSTEMS to any other person, entity

or company besides TEKSYSTEMS." (Id. ¶ 6). "Confidential Information" includes,

among other things, "customers' names, addresses, telephone numbers, and contact

persons; [and] customers' staffing requirements." (Id.).

     In addition to agreeing to the terms of the Employment Agreement, Perlson also

agreed to terms under the firm's Investment Growth Plan ("IGP"), which Allegis invited

Perlson to participate in because it deemed her a "Key Employee." (Allegis Grp. Inv.

Growth Plan for Key Emps. ["IGP"], ECF No. 45-4; Perlson Dep. 26:23–27:4; 28:14–

31:9). The IGP provides for deferred compensation subject to compliance with conditions

prohibiting engagement in competitive activities, customer solicitation, and misuse of

confidential information for a defined post-employment period. (John Procaccini Decl. ¶ 8,

ECF No. 45-1; 3d Am. Compl. ¶¶ 15–16). Allegis awards IGP participants "Investment

Unit[s]," which are "equivalent to a fixed dollar amount at the time of an award of the unit

and thereafter adjusted by Allegis' Board of Directors to reflect positive or negative

changes in value based on such financial factors as the Board deems appropriate." (John Procaccini Decl. ¶ 8).

The units that Allegis awards to each eligible employee under the IGP is contingent upon the employee agreeing to certain restrictions. (IGP ¶ 6.2). Employees sign an IGP Award Agreement agreeing to such restrictions each time they earn units. (John Procaccini Decl. ¶ 8). Specifically, Article 6.2 of the IGP states that "Awards under the Plan are conditioned on the Participant not (i) engaging in a Competitive Activity during the Participant's term of employment or during the eighteen (18) month period following his or her Separation from Service, or (ii) committing a Confidentiality Violation." (IGP ¶ 6.2). The IGP defines a "Competitive Activity" to include:

> Engaging in any aspect of the Companies' Business in which the Participant performed work or about which the Participant obtained Confidential or Proprietary Information during the two (2) year period preceding his or her Separation from Service, within a radius of two hundred fifty (250) miles of the office in which the Participant last worked or any other office in which the Participant worked during the two (2) years preceding his or her Separation from Service.

(Id.¶ 2.16). It further prohibits participants from "[a]pproaching, contacting, soliciting, or inducing any . . . client or customer of the Companies about which Participant obtained knowledge by reason of Participant's employment by the Companies . . . ." (Id.). With respect to confidentiality, the IGP prohibits participants from "fail[ing] . . . to keep confidential any Confidential or Proproetary Information" and "misappropriat[ing] . . . any Confidential or Proprietary Information." (Id. ¶ 2.18). If a participant does not follow the terms of the IGP, then:

[the Participant] shall be deemed not to have earned any Investment Units; shall forfeit all of the Investment Units credited to his or her Account; and shall be required to repay to the Company any and all amounts paid to the Participant in accordance with this Article 6 before the date the Participant engaged in the Competitive Activity or committed the Confidentiality Violation.

(Id. ¶ 6.2). Allegis awarded Perlson Units for her strong performance several times during her time at the company; each time Allegis awarded Perlson units, Perlson executed an Award Agreement agreeing to the restrictions. (Perlson Dep. 31:5–16; IGP Award Agreements, ECF No. 45-5).

After about ten years with the Company, Perlson resigned from TEKsystems on August 23, 2024. (Perlson Dep. 42:10–11; 70:11–24; 73:13–24). Under the terms of the IGP, on September 18, 2024, TEKsystems paid Perlson a check in the gross amount of $198,427.50, subject to Perlson's compliance with and fulfillment of the terms and conditions of Article 6 of the IGP. (Id. 69:10–22; 71:6–17). While she was still employed at TEKsystems, beginning around July 2024, Perlson founded Anchor Point Dynamics, an IT staffing business, by taking steps like forming an LLC under Massachusetts law, setting up a registered agent, building a website, making a Google Workspace, opening a bank account, and creating a business email. (Id. 42:6–13; 51:21–59:24; 62:10; 77:3–10; 189:23–190:4). Perlson sent multiple documents from TEKsystems' database to her new Anchor Point Dynamics email address, (see e.g., id. 84:5–85:8), and sent "a blast" of emails to customer prospects, some of whose information she obtained from TEKsystems' database, to develop business for Anchor Point Dynamics, (id. 65:2–5; 108:1–17). Perlson shut down Anchor Point Dynamics after being served with this lawsuit. (Id. 142:1–10).

B.    **Procedural History**

On October 23, 2024, TEKsystems filed a Complaint in this Court. (ECF No. 1). It filed an Amended Complaint on January 8, 2025, (ECF No. 18), a Second Amended Complaint on March 14, 2025, (ECF No. 28), and a Third Amended Complaint on May 1, 2025, (ECF No. 34). The Third Amended Complaint alleges: Breach of the IGP (Count I); Rescission (Count II); Breach of the Employment Agreement (Count III); Misappropriation of Trade Secrets (Count IV); and Breach of Duty of Loyalty (Count V). (3d Am. Compl. ¶¶ 57–101). TEKsystems seeks damages in the amount of $198,427.50, representing the IGP payment it made to Perlson, and damages under Counts III–V in an amount to be determined at trial. (Id. at 23).[2] TEKsystems filed a Motion for Summary Judgment on June 20, 2025. (ECF No. 44). Perlson filed a Cross Motion for Summary Judgment on July 25, 2025. (ECF No. 52). TEKsystems filed a consolidated Opposition and Reply on August 22, 2025. (ECF No. 56). Perlson filed an Opposition and Reply on September 12, 2025. (ECF No. 61).

## II.    DISCUSSION

A.    **Standard of Review**

1.    **Motion for Summary Judgment**

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor.

---

[2] Citations to the record refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system, except for deposition citations.

Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). A party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). Likewise, if the movant "demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts." Hall v. Wash. Metro. Area Transit Auth., 33 F.Supp.3d 630, 632 (D.Md. 2014). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459,

465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### 2. Cross-Motion for Summary Judgment

When the parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). This Court, however, must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993). If the evidence

presented by the nonmovant is merely colorable, or is not significantly probative, summary judgment must be granted. <u>Anderson</u>, 477 U.S. at 249–50.

**B.    Analysis**

**1.    Perlson's Motion for Summary Judgment (Count I)**

The Court will first consider Perlson's Cross Motion for Summary Judgment. Perlson moves for summary judgment on all counts. (Def.'s Mem. L. Supp. Mot. Summ. J. Opp'n Pls.' Mot. Summ. J. ["Cross Mot." or "Def.'s Opp'n"] at 1, ECF No. 52-1). Beginning with Count I, breach of the IGP, Perlson argues that the Court should grant summary judgment in her favor because the non-compete, non-solicitation, and non-disclosure provisions of the IGP are unenforceable. (Cross Mot. at 5). The Court will first address whether the IGP is enforceable as a matter of law.

**a.    Breach of Investment Growth Plan ("IGP")**

At the outset, the parties disagree on the standard of review the Court should use to evaluate whether the IGP is enforceable. Perlson argues the terms of the IGP are "more akin to an ongoing condition typical of restrictive covenants," (Cross Mot. at 6), while TEKsystems argues the terms are conditions precedent, (Pls.' Consolidated Resp. Opp'n Def.'s Mot. Summ. J. Reply Supp. Pls.' Mot. Summ. J. ["Pls.' Opp'n"] at 5, ECF No. 56). This distinction makes a difference: if the provisions in the IGP are restrictive covenants, they are subject to a "reasonableness" standard; such restrictions are enforceable so long as they are "confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." <u>Food Fair Stores,</u>

Inc. v. Greeley, 285 A.2d 632, 638 (Md. 1972) (quoting MacIntosh v. Brunswick Corp., 215 A.2d 222, 225 (Md. 1965)).[3] By contrast, in Allegis Group v. Jordan, 951 F.3d 203 (4th Cir. 2020), the Court of Appeals for the Fourth Circuit rejected the application of a "reasonableness" standard to evaluate the enforceability of conditions precedent, instead stating that "there is a good reason for treating this type of agreement differently – and more deferentially to the terms of the parties' agreement," id. at 211.

To determine which standard to apply, the Court first reviews the definitions of each contract term and then turns to the language of the contract. Restrictive covenants in the employment context are restraints on trade, typically in the form of covenants not to compete, and to be valid, they must be reasonable. Severn Mktg. Assocs., Inc. v. Doolin, No. CCB-09-3295, 2010 WL 3834994, at *3 (D.Md. Sept. 29, 2010). A condition precedent is "a fact, other than a mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises." Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc., 885 A.2d 381, 386 (Md.Ct.Spec.App. 2005) (quoting Chirichella v. Erwin, 310 A.2d 555, 557 (Md. 1973)). Conditions precedents are not subject to the same reasonableness standard as applied to restrictive covenants. Jordan, 951 F.3d at 211.

Here, the text of the IGP provides that:

> Awards under the Plan are conditioned on the Participant not
> (i) engaging in a Competitive Activity during the Participant's

---

[3] The parties do not dispute that Maryland law applies to all the claims in TEKsystems' Third Amended Complaint. (See e.g., Cross Mot. at 5; Pls.' Mem. L. Supp. Mot. Summ. J. at 16 n.5, ECF No. 45 ("The IGP and Agreement are governed by Maryland law.")).

> term of employment or during the eighteen (18) month period following his or her Separation from Service, or (ii) committing a Confidentiality Violation. If a Participant engages in either a Competitive Activity during the Participant's term of employment or during the eighteen (18) month period following his or her Separation from Service or commits a Confidentiality Violation, the Participant shall be deemed not to have earned any Investment Units; shall forfeit all of the Investment Units credited to his or her Account; and shall be required to repay to the Company any and all amounts paid to the Participant in accordance with this Article 6 before the date the Participant engaged in the Competitive Activity or committed the Confidentiality Violation.

(IGP ¶ 6.2 (emphasis added)). Based on the plain language of this provision, including words such as "conditioned on," (id.), the Court finds these provisions are conditions precedent. See Jordan, 951 F.3d at 210 ("Based on the Plan's text, we conclude that Sections 9(3) and 9(5) are conditions precedent, not restrictive covenants or forfeiture provisions, inasmuch as the Incentive Plan explicitly uses words indicative of conditionality.").

Perlson's arguments otherwise are unpersuasive. For instance, Perlson argues that the "IGP's restrictive covenants are not conditions precedent because they purport to impose a continuing obligation that continues even after Plaintiffs have fully performed by paying [Perlson] the IGP award." (Cross Mot. at 6). The Court, however, agrees with TEKsystems that "[n]othing about the timing of each party's obligations under the IGP converts the condition precedent for Perlson into 'an ongoing condition typical of restrictive covenants.'" (Pls.' Opp'n at 10). Additionally, this Court found a similar IGP Agreement to contain conditions precedent in Allegis Grp., Inc. v. Bero, 689 F.Supp.3d 81, 138 (D.Md. 2023) ("Based on the plain language of the text in the IGP, the prohibitions on

engaging in competitive activity or committing a confidentiality violation are clearly conditions precedent to receiving an award under the Plan."), aff'd, No. 23-2023, 2025 WL 2141298 (4th Cir. July 29, 2025); see also Stannard v. Allegis Grp., Inc., No. TCB-08-CV-3357, 2009 WL 1309751, at *5 (N.D.Ga. Apr. 27, 2009) (evaluating similar incentive plan agreement and finding "that this clear and unambiguous language makes compliance with the § 9 provisions a condition precedent to receiving benefits under the Plan"). Accordingly, the Court finds the provisions in the IGP enforceable as conditions precedent,[4] and Perlson's Motion for Summary Judgment as to Count I will be denied.[5]

---

[4] Even if the Court applied a reasonableness standard, the IGP passes muster. First, its scope is reasonable because "the Incentive Plan explicitly named the business interests that its conditions were intended to protect—the long-term economic growth of Allegis and its subsidiaries as measured by the value of Allegis's stock. We conclude that this is a legitimate interest appropriately served by the conditions stated in the Plan." Jordan, 951 F.3d at 211; (IGP ¶¶ 1.1(c), 2.13, 2.32). Second, the IGP does not impose an undue hardship on Perlson because she voluntarily participated in the IGP as a highly compensated Key Employee and had the choice of accepting payment or engaging in prohibited activities under the IGP. See Jordan, 951 F.3d at 212 ("[I]f the employee[] believed that [she] could earn more in income by competing in the market for staffing services than [she] w[as] entitled to receive under the Incentive Plan, [she] w[as] free to do so."); (see also Perlson Dep. 26:23–27:4; 28:14–34:13; John Procaccini Decl. ¶ 6; IGP Award Agreements). Third, "public policy favors the freedom to contract for such a plan because unlike traditional restrictive covenants, which may benefit the employer at the expense of the former employee's ability to earn a livelihood, both employers and employees benefit under agreements such as the Incentive Plan." Jordan, 951 F.3d at 212.

[5] Perlson does not move for summary judgment on breach of the IGP, resting apparently on the Court finding the agreements unenforceable as a matter of law. (See Cross Mot. at 1 (conceding Perlson engaged in a "harmless, technical violation" of TEKsystems' agreements and criticizing TEKsystems' "scorched earth approach" to addressing said violation)). Accordingly, the Court reserves the issue of breach of the IGP for when it discusses TEKsystems' Motion for Summary Judgment.

### b.    Rescission (Count II)

The Court next turns to Perlson's assertion that she is entitled to summary judgment as to Count II of the Third Amended Complaint, which concerns recession. (Cross Mot. at 21). Perlson argues she is entitled to summary judgement on this claim because the extraordinary remedy of recission is not warranted. (Id.). Because TEKsystems pleads recission in the alternative, (3d. Am. Compl. ¶¶ 63–64), the Court need not reach this count.

### c.    Breach of Employment Agreement (Count III)

Perlson next argues that she is entitled to summary judgment as to Count III because the Employment Agreement's restrictive covenants, including its non-compete, non-solicitation, and non-disclosure covenants, are not enforceable. (Cross Mot. at 22). The Court will review the facial enforceability and factual enforceability of each challenged provision in turn.

### i.    Non-Compete

Perlson argues that the non-compete covenant in the Employment Agreement is unenforceable. (Cross Mot. at 22–23). Under Maryland law, whether a restrictive covenant is enforceable depends upon the unique language of the covenant at issue, Holloway v. Faw, Casson & Co., 572 A.2d 510, 515 (Md. 1990), and the specific facts of the case, Ruhl v. F.A. Bartlett Tree Expert Co., 225 A.2d 288, 291 (Md. 1967). Specifically, a restrictive covenant must satisfy the following four requirements in order to be enforceable: "(1) the employer must have a legally protected interest, (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose an undue hardship on the

employee, and (4) the covenant cannot violate public policy." <u>Deutsche Post Glob.</u> <u>Mail, Ltd. v. Conrad</u>, 116 F.App'x 435, 438 (4th Cir. 2004) (citing <u>Silver v.</u> <u>Goldberger</u>, 188 A.2d 155, 158 (Md. 1963)).

Here, Perlson mainly challenges scope (Cross Mot. at 22–24), so the Court will focus its analysis accordingly. The non-compete contains two distinct proscriptions: Perlson may not (1) "directly or indirectly engage in or prepare to engage in . . . any aspect of TEKsystems' Business for which [Perlson] performed services or about which [Perlson] obtained Confidential Information" during the last two years of her employment at TEKsystems; and (2) Perlson may not be "employed by [ ] any business that is engaging in or preparing to engage in any aspect of TEKsystems' Business for which [Perlson] performed services or about which [Perlson] obtained Confidential Information" during the last two years of her employment at TEKsystems. (Emp. Agreement ¶ 3).

Perlson advances two main arguments in support of her position that the non-compete's scope is too broad. First, she argues that the covenant "does not proscribe future employment based on the type of work [she] might perform at a future employer, but based on whether the future employer engages in any kind of work that [she] engaged in at TEKsystems or obtained confidential information about." (Cross Mot. at 23). The "second major problem," in Perlson's view, is the confidential information restriction, which functions to prohibit Perlson from working for any business about which she obtained confidential information "even if she never worked on that type of business or with that client herself." (<u>Id.</u>). The Court will address each argument in turn.

First, the Court disagrees with Perlson's argument that the non-compete covenant focuses on the employer rather than the work Perlson does at the next job because that interpretation of the agreement renders limiting language in the non-compete superfluous. Setting aside the confidential information issue for the moment, the non-compete states that Perlson may not "directly or indirectly engage in or prepare to engage in . . . any aspect of TEKsystems' Business for which [Perlson] performed services" during the last two years of her employment at TEKsystems. (Emp. Agreement ¶ 3 (emphasis added)). Perlson's statement that the covenant "does not proscribe [Perlson's] future employment based on the type of work [she] might perform at a future employer, but based on whether the future employer engages in any kind of work that [Perlson] engaged in at TEKsystems," (Cross Mot. at 23), reads narrowing language out of the covenant, and the Court must give effect to every word in the contract, Sy-Lene of Wash., Inc. v. Starwood Urb. Retail II, 829 A.2d 540, 546 (Md. 2003) (explaining Maryland follows objective theory of contract interpretation, under which "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract" (citation modified)).

Second, with respect to the confidential information provision, while this is a closer call, the Court agrees with Perlson's argument that the confidentiality provision is impermissibly broad. As stated, the non-compete prohibits Perlson from engaging in a business in which she "performed services or about which [Perlson] obtained Confidential Information." (Emp. Agreement ¶ 3). "Confidential Information" is defined in Paragraph 6 of the Employment Agreement:

> For purposes of this Agreement, "Confidential Information" shall mean information not generally known by the competitors of TEKSYSTEMS or the general public concerning TEKSYSTEMS' Business that TEKSYSTEMS takes reasonable measures to keep secret, including but not limited to: financial information and financial controls; sales and marketing strategies; acquisition plans; pricing and costs; customers' names, addresses, e-mail addresses, telephone numbers, and contact persons; customers' staffing requirements; margin tolerances regarding pricing; the names, e-mail addresses, addresses, telephones numbers, skill sets, availability and wage rates of Contract Employees; sales, recruiting, pricing and marketing techniques; sales and recruiting manuals; forms and processes for acquiring and recording information; salary and performance evaluations of Regular Employees; and management practices, procedures and processes. These restrictions on use or disclosure of Confidential Information will only apply for three (3) years after the end of EMPLOYEE's employment where information that does not qualify as a trade secret is concerned. The restrictions will apply to trade secret information for as long as the information remains qualified as a trade secret.

(Id. ¶ 6). The Employment Agreement prohibits trade secrets from disclosure indefinitely, while confidential information cannot be disclosed for three years. (Id.). As this Court observed when examining nearly identical language in the employment agreement in Bero, the issue with such an expansive definition of confidential information is that "an employee lacks 'firm, solid guidance on what he can and cannot do if he leaves his employer,' because it is unclear what information in the clause is a trade secret and what information is subject to use after the [three]-year restricted period," 689 F.Supp.3d at 133–34 (quoting SNS One, Inc. v. Hage, BEL-10-1592, 2011 WL 2746713, at *4 (D.Md. July 11, 2011)). The Bero Court found this language unenforceable. Id. at 134.

TEKsystems counters that Maryland courts recognize that employers have a right to protect their confidential information and sets forth cases that advance this principle. (Pls.' Opp'n at 15–17). The Court finds these cases distinguishable.

First, TEKsystems relies on Padco Advisors v. Omdahl, 179 F.Supp.2d 600 (D.Md. 2002), for the proposition that "confidential information is a valid protectable interest under Maryland law and supplies sufficient basis for enforcement of restrictive covenant." (Pls.' Opp'n at 17). While Padco involved a confidential information restriction, the Court there focused on the length of the covenant, and the definition of confidential information as defined in the agreement was not in dispute like it is here. Padco Advisors, 179 F.Supp.2d at 606–07.

TEKsystems next cites Ruhl v. F.A. Bartlett Tree Expert Co., 225 A.2d 288 (Md. 1967), for the proposition that "confidential information alone can justify enforcement of restrictive covenants." (Pls.' Opp'n at 17). Ruhl involved a manager who worked in the tree-care business in Easton, Maryland. 225 A.2d at 290–91. The manager left the first business he ever worked for, the F. A. Bartlett Tree Expert Company ("Bartlett"), to start a rival tree-care business in Easton. Id. After the manager started his own tree care business, Bartlett sued, complaining that two thirds of the manager's customers at his rival company were former Bartlett customers. Id. at 291. The court, in affirming the trial court's finding that the non-compete was valid, explained that "in all these cases, on varying facts, it is the extent and importance of the personal contact of the employee with the customers to which the Court has looked as largely determining whether the restraint is a reasonable one for the protection of the employer's business." Id. at 292. Here, unlike the manager in Ruhl

who brought in new clients for his employer and who was essential to growing the business, (id. at 290–91), Perlson asserts she was assigned one client for the last five years preceding her termination, (Perlson Decl. ¶¶ 2, 5, ECF No. 52-2).

TEKsystems also directs the Court to General Parts Distribution, LLC v. St. Clair 11-03556-JFM, 2011 WL 6296746 (D.Md. Dec. 14, 2011), for the proposition that "employers have a protectable interest in preventing a former employee from using customer contacts learned during employment," (Pls.' Opp'n at 15). This case directly supports TEKsystems' position, as the Court there explained that confidential information is a valid protectable interest. St. Clair, 2011 WL 6296746, at *4. But the Court decided St. Clair at the Temporary Restraining Order and Preliminary Injunction stage—in other words, on an expedited basis and with a limited record. See id. at 1. Further, St. Clair is not binding on this Court.[6]

Finally, TEKsystems cites Ameritox, Ltd. v. Savelich, 92 F.Supp.3d 389 (D.Md. 2015), another case decided at the Preliminary Injunction stage, id. at 392, for the proposition that "restrictive covenants may be used to protect against misuse of customer information," (Pls.' Opp'n at 17). Upon closer review, Ameritox is not favorable to TEKsystems' position. In Ameritox, the Court declined to enforce both the non-solicitation and non-compete covenants at issue. 92 F.Supp.3d at 399–401. First, the Court declined to

---

[6] And this case resolved prior to final disposition. (See Gen. Parts Distrib., LLC v. St. Clair, 11-cv-3556, Dec. 22, 2011 Stipulated Consent Order, ECF No. 12). The Court takes judicial notice of this Order. See Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) (noting that "[t]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records").

enforce the non-solicitation covenant, deeming it impermissibly overbroad because the employer had not shown that the employee worked or interacted with those encompassed by the provision. Id. at 400. Second, the Court rejected the confidentiality covenant as unenforceable because the scope of confidential information covered in the agreement exceeded that of the Maryland Uniform Trade Secrets Act ("MUTSA"). See id. at 401. ("Although certain enumerated items of [the employer's] 'Confidential Information' are encompassed by the MUTSA, some of it arguably extends, in some ill-defined fashion, beyond the MUTSA's scope; for example, knowledge or information about mere services offered by Ameritox, its ideas, and plans, and, potentially, its marketing and sales methods (to the extent those are in the public domain). As [the former employee] asserts, some of that knowledge is generally known in the industry, or within his general knowledge. . . . Accordingly, the confidentiality covenant is overly broad, and [the employer] has not shown that it is likely to succeed on the merits of its enforcement.").

In sum, these cases confirm that although TEKsystems has a valid interest in protecting its confidential information, any covenant seeking to do so must be reasonable under the law. For all these reasons, the Court agrees with Perlson that the scope of the non-compete, as written, is overly broad.

The Court's analysis does not end there. Under Maryland's "blue pencil" rule, "if a restrictive covenant is unnecessarily broad, a court may blue pencil or excise language to reduce the covenant's reach to reasonable limits." Deutsche, 116 F.App'x at 439 (citation modified). The Court finds the "confidential information" provision neatly severable and will excise that part from the agreement. The blue-penciled covenant restricts Perlson from:

19

> [E]ngag[ing] in, or prepar[ing] to engage in, or be[ing]
> employed by any business that is engaging in or preparing to
> engage in, any aspect of TEKSYSTEMS' Business for which
> EMPLOYEE performed services ~~or about which EMPLOYEE~~
> ~~obtained Confidential Information~~ during the two (2) year
> period preceding termination of employment, within a radius
> of fifty (50) miles from the office in which EMPLOYEE
> worked at the time EMPLOYEE's employment terminated or
> any other office in which EMPLOYEE worked during the two
> (2) year period preceding termination of employment
> ("Restricted Area").

(Emp. Agreement ¶ 3). Because the Court finds the non-compete, as revised, enforceable, the Court will deny Perlson's Motion for Summary Judgment as to the enforceability of the Employment Agreement's non-compete covenant.

The Court will next turn to breach of the non-compete. Perlson does not dedicate much argument against breach of the non-compete, instead resting almost exclusively on the facial enforceability of the covenants. (See generally Cross Mot.). In any event, to the extent that Perlson moves for summary judgment as to breach of the non-compete, viewing the facts in a light most favorable to TEKsystems, the Court will deny the Motion for the following reasons.

Perlson concedes that she launched Anchor Point Dynamics, "which she intended to engage in IT personnel staffing," but counters that while she "contacted some TEKsystems customers about entering into business . . . none of them were her former clients. She never obtained customers, generated revenue, or stole any [of] TEKsystems' customers." (Cross Mot. at 4–5; Perlson Decl. ¶¶ 6–7). Perlson attests that "[w]hen [she] reached out to TEKsystems customers for the purpose of soliciting business for Anchor Point Dynamics, none of the entities/individuals [she] reached out to were

entities/individuals who [she] had personally worked with/serviced while working at TEKsystems." (Perlson Decl. ¶ 6). On this record, the Court finds that a genuine dispute of material fact exists as to breach that precludes the entry of summary judgment in Perlson's favor because even if the customers that Perlson emailed were not her clients, the record is unclear about whether Perlson nevertheless performed services for any of those clients to whom she sent out "a blast" of emails. (Perlson Dep. 65:2–8; 195:8–197:18). In other words, Perlson appears to be reading a client-specific provision into the non-compete that is not there. As a result, the Court cannot conclude that Perlson did not violate the non-compete covenant, and the Court will deny Perlson's Motion accordingly.

### ii.    Non-Solicitation

Perlson next challenges the non-solicitation covenant in the Employment Agreement as overbroad and, therefore, unenforceable. (Cross Mot. at 24). Subsection (a)(i) of the non-solicitation covenant prohibits Perlson from communicating with clients for the purposes of "enter[ing] into a business relationship . . . if the business relationship is competitive with any aspect of TEKsystems' Business for which [Perlson] performed services" during her final two years with TEKsystems "or about which she obtained Confidential Information." (See Emp. Agreement ¶ 4 (a)). Subsection (b)(ii) prohibits Perlson from soliciting clients in an attempt to reduce or eliminate the business such clients conduct with TEKsystems. (Id. ¶ 4(ii)).

The non-solicitation covenant uses language identical to the non-compete, (compare Emp. Agreement ¶ 3, with Emp. Agreement ¶ 4), and the parties generally raise the same arguments for and against the facial enforceability of the non-solicitation covenant as with

the non-compete covenant, (Cross Mot. at 26; Pls.' Opp'n at 14–17, 22–23). As a result, for the same reasons the Court discussed when reviewing the non-compete, the Court concludes this provision is enforceable, with the exception of the confidential information provision. As with the non-compete covenant, the Court will blue-pencil out the confidential information provision as impermissibly broad. The revised version prohibits Perlson from:

> directly or indirectly . . . [c]ommunicat[ing] with any . . . customer of TEKSYSTEMS ~~and, about which EMPLOYEE obtained Confidential Information or~~ with which EMPLOYEE did business on TEKSYSTEMS' behalf during the two (2) year period preceding termination of employment for purposes of . . . entering into any business relationship with such customer if the business relationship is competitive with any aspect of TEKSYSTEMS' Business for which EMPLOYEE performed services ~~or about which EMPLOYEE obtained Confidential Information~~ during the two (2) year period preceding termination of employment, or . . . reducing or eliminating the business such customer conducts with TEKSYSTEMS . . . .

(Emp. Agreement ¶ 4). As revised, the non-solicitation covenant's scope is not wider than is reasonably necessary to protect TEKsystems' business or goodwill and is enforceable.

The Court will next address whether Perlson breached the non-solicitation covenant. Perlson concedes that although she contacted "TEKsystems customers about entering into business," none of them were her former clients. (Perlson Decl. ¶ 6). As with the non-compete, the Court finds that Perlson is not entitled to summary judgment as to breach because, viewing the facts in a light most favorable to TEKsystems, the Court does not find the non-solicitation covenant to be as narrow as Perlson describes. In other words, the

Court does not find Perlson's statement that she primarily worked with one client dispositive on the question of whether she nevertheless breached the revised non-solicitation covenant. (See Perlson Decl. ¶¶ 2, 5). As a result, the Court will deny Perlson's Motion for Summary Judgment as to the non-solicitation covenant.

### iii.    Non-Disclosure

Perlson next argues that the non-disclosure provision is impermissibly overbroad. (Cross Mot. at 26–27). The non-disclosure covenant prohibits Perlson from "us[ing], disclos[ing] or divulge[ing] any Confidential Information of TEKsystems to any other person, entity or company besides TEKsystems." (Emp. Agreement ¶ 6). For the reasons set forth below, the Court agrees with Perlson that this covenant is not enforceable and will grant her summary judgment as to the non-disclosure covenant, necessarily defeating TEKsystems Motion for Summary Judgment as to this covenant.

Perlson argues that the non-disclosure covenant is unenforceable because of its breadth. (Cross Mot. at 26–27). "'[R]estrictive covenants may be applied' to protect against 'the future misuse of trade secrets, routes or lists of clients, or solicitation of customers.'" Ameritox, 92 F.Supp.3d at 401 (quoting Becker v. Bailey, 299 A.2d 835, 838 (Md 1973)). But "questions arise as to the enforceability of the Confidentiality Provisions by virtue of their having wider breadth than the [MUTSA]." Id. at 401 (quoting Structural Pres. Sys., LLC v. Andrews, MJG-12-1850, 2013 WL 3820023, at *4 (D.Md. July 23, 2013)).

The MUTSA defines "Trade secret" as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that . . . (1) Derives independent economic value, actual or potential, from

> not being generally known to, and not being readily
> ascertainable by proper means by, other persons who can
> obtain economic value from its disclosure or use; and (2) Is the
> subject of efforts that are reasonable under the circumstances
> to maintain its secrecy.

Md. Code Ann., Com. Law § 11-1201(e). Here, the definition of Confidential Information

in the non-disclosure covenant is far broader than the definition of "trade secret" in

MUTSA. (See Emp. Agreement ¶ 6). Indeed, the Confidential Information provision

pertains to information that does not fit Maryland's statutory definition of trade secrets but

extends beyond it "in some ill-defined fashion." (Id.); Ameritox, 92 F.Supp.3d at 401. In

addition, under Paragraph 6, information can be deemed confidential merely because the

Company takes "reasonable measures" to protect it. (Emp. Agreement ¶ 6). But there is no

indication as to how an employee would know whether the Company has taken such

measures. Further TEKsystems' restrictions on use of trade secrets apply in perpetuity,

(id.), but as to confidential information that does not qualify as a trade secret, the restriction

applies only for three years, (id.). The clause, however, does not specify which category

applies to the laundry list of items subject to the clause. As a result, an employee lacks

"firm, solid guidance on what he can and cannot do if he leaves his employer," because it

is unclear what information in the clause is a trade secret and what information is subject

to use after the three-year restricted period. Hage, 2011 WL 2746713, at *4.

The Court declines to apply the blue-pencil doctrine to the terms of the

non-disclosure covenant to salvage it. The covenant's deficiency does not arise from

specific offending terms that might easily be excised. Rather, the overbreadth of the

non-disclosure covenant arises from its failure to clearly define and distinguish the kinds

24

of information encompassed by the terms "trade secret" and "Confidential Information."
(Emp. Agreement ¶ 6). To remedy such an error, the Court would be forced to rewrite the
non-disclosure covenant. See Medispec, Ltd. v. Chouinard, 133 F.Supp.3d 771, 775 n.3
(D.Md. 2015) ("Because no independent sentence or clause could be excised here to narrow
sufficiently the scope, blue penciling is inappropriate."). Because the Court finds the
non-disclosure covenant unenforceable, the Court need not address breach. The Court will
accordingly grant summary judgment as to the non-disclosure covenant in favor of Perlson.

### d.    Maryland Uniform Trade Secrets Act (Count IV)

Perlson next moves for summary judgment as to TEKsystems' MUTSA claim.
(Cross Mot. at 28). Perlson argues that TEKsystems has "wholly failed to identify the trade
secrets allegedly misappropriated and have not alleged or demonstrated damages." (Id. at
29). TEKsystems counters that it has identified the information Perlson took, that it has
demonstrated its trade secret status, and that it need not prove actual damages. (Pls.' Opp'n
at 23–26). For the reasons set forth below, the Court finds that genuine disputes of fact
preclude the grant of summary judgment.

The MUTSA provides the statutory remedies for a business alleging
misappropriation of a trade secret. "Misappropriation" means either the "[a]cquisition of a
trade secret of another by a person who knows or has reason to know that the trade secret
was acquired by improper means;" or "[d]isclosure or use of a trade secret of another
without express or implied consent . . . ." Md. Code Ann., Com. Law § 11-1201(c). As a
reminder, "trade secret" under the MUTSA means information that:

> (1) derives independent economic value, actual or potential,

from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Id. § 11-1201(e)(1)–(2).

Whether the documents at issue in any given case qualify as trade secrets is a question of fact. GTCO Corp. v. Kontron Elektronik GmbH, 829 F.2d 1119, at *2 (4th Cir. 1987) (unpublished table decision). Philips N. Am., LLC v. Little, No. 5:20-CV-00657-BO, 2024 WL 218609, at *3 (E.D.N.C. Jan. 19, 2024) ("The existence of a trade secret is ordinarily a question fact to be determined by the fact finder, and, thus, is not typically resolved at summary judgment."); Synopsys, Inc. v. Risk Based Sec., Inc., 70 F.4th 759, 769 (4th Cir. 2023). Plaintiffs, however, bear the "burden of producing some evidence that [the documents] me[e]t the definition of a trade secret." Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 661 (4th Cir. 1993).

Here, TEKsystems has met this burden. TEKSystems directs the Court's attention to four documents in the record that it purports contain trade secrets: (1) a TEKsystems slide deck named "Cloud Migration at Scale"; (2) a Staffing Services Agreement; (3) a TEKsystems slide deck named "Enterprise Applications Management"; and (4) two lists of dozens of potential recruits with contact information that Perlson admits she at least partially drew from TEKsystems's Salesforce database and then exported into a Google Doc. (Pls.' Opp'n at 25).

On this record, the Court concludes that TEKsystems has done more than rely on catch-alls or categories of documents to prove these documents may contain trade secrets.

For example, the Staffing Services Agreement that Perlson concedes she forwarded to her Anchor Point Dynamics email "includes the terms of TEKsystems' relationship with its customer, the customer's requirements, information pricing and payments, and other material[] terms related to that business relationship." (Pls.' Opp'n at 24–25; Perlson Dep. 78:7–82:2). This information could be extremely valuable in the hands of a competitor, which may explain why Perlson emailed it to herself. See Albert S. Smyth Co. v. Motes, No. CCB-17-677, 2018 WL 3635024, at *4 (D.Md. July 31, 2018) (finding confidential customer records and lists constitute trade secrets because they would be economically valuable to a competitor); Philips N. Am. LLC v. Hayes, No. ELH-20-1409, 2020 WL 5407796, at *8–9 (D.Md. Sept. 9, 2020) (stating customer lists can constitute trade secrets when "the employer has invested time and resources into the development of the customer information").[7]

Contrary to Perlson's arguments, TEKSystems has done enough to create a triable issue. See InteliClear, LLC v. ETC Glob. Holdings, Inc., 978 F.3d 653, 659 (9th Cir. 2020) (affirming trial court's conclusion that a genuine dispute of material fact existed where general declarations were bolstered by specifics); Little, 2024 WL 218609, at *4–5. In that same light, however, the Court agrees with Perlson that it is unable to declare those

---

[7] The Court rejects Perlson's argument that TEKsystems impermissibly identifies new documents in its reply brief in support of its MUTSA claim. (Def.'s Reply Supp. Cross-Mot. Summ. J. at 9, ECF No. 61). This is not new evidence; Perlson testified to these documents, admitted as exhibits, in her deposition, and TEKsystems cited that testimony and discussed these documents in its opening brief. (See Pls.' Mem. L. Supp. Mot. Summ. J. at 11, ECF No. 45 (citing Perlson Dep. 78:7–24; 79:21–23; 82:10–83:23; 84:5–19; 85:17–86:3; 88:10–20; 93:17–94:11; 96:2–12; 97:4–98:4; 111:1–112:10; 114:22–115:7; 116:23–117:17; 118:5–23; 119:6–120:4; 121:4–122:19; 122:22–124:16)).

documents as trade secrets on this record. Id. Accordingly, the Court will deny Perlson's Motion for Summary Judgment as to Count IV.

      **e.**      **Duty of Loyalty (Count V)**

Perlson next argues she is entitled to summary judgment on TEKsystems' breach of duty of loyalty claim because "Plaintiffs have wholly failed to allege or demonstrate any harm resulting from [Perlson's] alleged misappropriation of confidential information." (Cross Mot. at 32). More specifically, Perlson asserts that TEKsystems did not incur any harm because Anchor Point Dynamics never obtained any clients or did any business. (Perlson Decl. ¶¶ 7–8). TEKsystems counters that it "has incurred the significant costs of investigation, forensic examination, and bringing suit to secure and recover its proprietary information and to identify the extent to which Perlson misappropriated and used that information." (Pls.' Opp'n at 26–27).

Under Maryland law, "the duty of loyalty is an implied duty, 'read into every contract of employment . . . .'" Weichert Co. of Md. v. Faust, 19 A.3d 393, 400 (Md. 2011) (quoting Md. Metals, Inc. v. Metzner, 382 A.2d 564, 568 (Md. 1978)). Maryland has established a three-part test for evaluating breach of fiduciary duty claims: a plaintiff must show "(1) the existence of a fiduciary relationship; (2) breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." Plank v. Cherneski, 231 A.3d 436, 442 (Md. 2020).

Here, Perlson does not dispute the first two prongs. (See Cross Mot. at 31–32 (only addressing third prong)). Perlson instead argues that TEKsystems fails to prove the third prong of harm because, essentially, her business failed. (See Perlson Decl. ¶ 7). The Court

rejects this argument for two main reasons.

First, Perlson cites no binding caselaw to support that a former employee soliciting an employer's customers on behalf of her new business but failing to ultimately generate revenue means that no harm occurred to the employer. Moreover, the cases that Perlson relies on to ostensibly support this position are factually distinct. For example, in <u>GEO Specialty Chemicals, Inc. v. Husisian</u>, 951 F.Supp.2d 32 (D.D.C. 2013), the court found that plaintiff failed to state a claim as to breach of fiduciary duty where plaintiff "did not say that actual disclosure [of confidential information] has occurred or that any harm has been suffered as a result of defendants' work for the [] companies." <u>Id.</u> at 44. But here, Perlson does not dispute that she contacted TEKsystems' customers, (Perlson Dep. 195:8–197:7; 65:2–8), and TEKsystems argues that it has sustained harm, (Pls.' Opp'n at 26–27).

Second, unlike in <u>Aerotek, Inc. v. Nosky</u>, No. 24-1372, 2025 WL 2141297 (4th Cir. July 29, 2025), where the Fourth Circuit affirmed a district court's grant of summary judgment where there was "no evidence to suggest that [the former employee] contacted any of [the employer]'s customers," <u>id.</u> at *2, here, Perlson indeed contacted TEKsystems clients from her Anchor Point Dynamics email address, (Perlson Dep. 195:8–197:7; 65:2–8). As a result, the Court will deny Perlson's Motion for Summary Judgment as to Count V.

### 2.    TEKSystems' Motion for Summary Judgment[8]

TEKsystems moves for summary judgment as to all counts. (Pls.' Mem. L. Supp. Mot. Summ. J. ["Pls.' Mot."] at 1, ECF No. 45). The Court will resolve each count in turn, viewing the facts in a light most favorable to Perlson. Rossignol, 316 F.3d at 523.

### a.    Investment Growth Plan (Count I)

Turning first to the IGP, as discussed earlier, the Court already has found this agreement to be enforceable as a matter of law. With respect to breach, and viewing the IGP "more deferentially to the terms of the parties' agreement" as conditions precedent to incentive payments rather than traditional restrictive covenants, Jordan, 951 F.3d at 211, the Court finds there is no genuine dispute that Perlson breached the condition precedent under Section 6.2(i) of the IGP by "engaging in a Competitive Activity during [her] term of employment [and] during the eighteen (18) month period following" her resignation, (IGP ¶ 6.2).

As a reminder, the IGP defines "Competitive Activity" as "[e]ngaging in any aspect of [TEKsystems'] Business in which [Perlson] performed work . . . during the two (2) year period preceding [her resignation]" within 250 miles from the office. (Id. ¶ 2.16(a)). "Competitive Activity" also includes approaching TEKsystems' clients "about which [Perlson] obtained knowledge by reason of [her] employment by [TEKsystems] in an

---

[8] Also pending before the Court is TEKsystems' Motion to Seal (ECF No. 58). The Motion to Seal refers to exhibits containing sensitive business information, trade secrets, and otherwise confidential information, some of which is already covered under the Parties' Stipulated Protective Order (ECF No. 31). The Motion to Seal is unopposed and will be granted. See Local Rule 105.11 (D.Md. 2025).

attempt to enter into any business relationship with a client . . . [of TEKsystems] if the business relationship is competitive with any aspect of TEKsystems' business" in which Perlson worked two years prior to her resignation or "reduce or eliminate the business such client . . . conducts with the companies." (Id. ¶ 2.16(b)).

Here, there is no genuine dispute that Perlson formed a business which would compete directly with TEKsystems. (Perlson Dep. 62:6–12; 141:21–142:10; 158:13–16). There is no genuine dispute that she was operating that business in Scituate and Eastham, Massachusetts, within the 250-mile radius prohibited by Section 2.16(a) of the IGP. (Id. 138:19–139:6; 184:17–21). Further, Perlson admits that she contacted TEKsystems' customers, some of which she learned about in her employment at TEKsystems, to do business with Anchor Point Dynamics. (Id. 195:8–197:7; 65:2–8). The record undisputably shows that Perlson did not comply with the terms of the IGP. Accordingly, viewing the facts in the light most favorable to Perlson, the Court will grant TEKsystems' Motion for Summary Judgment as to Count I, and the Court need not reach Count II, Recission, because TEKsystems pleaded this in the alternative to Count I. (3d Am. Compl. ¶ 63).

### b.    Employment Agreement (Count III)

As discussed above, a genuine dispute of material fact exists as to breach of the non-compete and non-solicitation covenants in the Employment Agreement, and this does not change when the Court views the facts in a light most favorable to Perlson. Further, the Court will deny TEKsystems' Motion for Summary Judgment as to the non-disclosure covenant because it is not enforceable. Accordingly, for all these reasons, the Court will deny TEKsystems' Motion for Summary Judgment as to Count III.

### c.    MUTSA (Count IV)

As stated previously, the Court finds there are genuine dispute of facts precluding the entry of summary judgment as to TEKsystems' claim for breach of the MUTSA, and this does not change when the Court views the facts in a light most favorable to Perlson. The Court, for these same reasons, will deny TEKsystems' Motion for Summary Judgment as to Count IV.

### d.    Duty of Loyalty (Count V)

Finally, for the reasons set forth below, the Court will grant TEKsystems' Motion for Summary Judgment as to breach of the duty of loyalty. TEKsystems has established all three prongs of this count under Maryland law, Plank, 231 A.3d at 442, and there are no genuine disputes of material fact.

First, "as an employee [of TEKsystems, Perlson] [was] required to 'act solely for the benefit of [her] employer in all matters within the scope of employment' and to refrain from 'actively competing with [her] employer during the tenure of [her] employment.'" Allegis Grp., Inc. v. Nosky, No. PX-22-1516, 2024 WL 1282831, at *6 (D.Md. Mar. 26, 2024) (quoting Md. Metals, 282 Md. at 38), aff'd, No. 24-1372, 2025 WL 2141297 (4th Cir. July 29, 2025). Second, Perlson breached that duty by forming Anchor Point Dynamics, a business directly competing with TEKsystems, while she was still employed by TEKsystems and then soliciting TEKsystems' clients for Anchor Point Dynamics. (Perlson Dep. 195:8–197:7; 65:2–8). This is a quintessential breach of the duty of loyalty an employee owes their employer. See Weichert, 19 A.3d at 400 (explaining that duty of loyalty is an implied duty "read into every contract of employment" and requires that an

32

"employee act solely for the benefit of his employer in <u>all matters</u> within the scope of employment, avoiding <u>all conflicts</u> between his duty to the employer and his own self-interest" (emphasis added)). Third, TEKsystems suffered harm because unlike cases in which there is no actual disclosure or solicitation, <u>see</u> <u>Nosky</u>, 2024 WL 1282831, at *6, here, Perlson solicited TEKsystems' clients, (Perlson Dep. 195:8–197:7; 65:2–8). Perlson ultimately shutting down Anchor Point Dynamics or failing to generate revenue does not change this result. The Court, therefore, will grant summary judgment in favor of TEKsystems as to Count V.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant the Motions for Summary Judgment (ECF Nos. 44, 52) in part and deny them in part. A separate Order follows.

Entered this 25th day of November, 2025.


_____
/s/

George L. Russell, III
Chief United States District Judge